# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CASE NO: 3:20-cr-79 |
| | ) | |
| vs. | ) | **REPORT AND RECOMMNEDATION** |
| | ) | **ON DEFENDANT'S MOTION TO** |
| JAMIE LEE MILES, | ) | **SUPPRESS** |
| | ) | |
| Defendant. | ) | |

## TABLE OF CONTENTS

I.   INTRODUCTION…………………………………………………………….....2

II.   FINDINGS OF FACT……………………………………………………….…….3

    A.  TESTIMONY OF LIEUTENANT MATT HENDRICKS……………………..……..3

    B.  TESTIMONY OF DEPUTY CHASE MURRAY……………………………………5

    C.  TESTIMONY OF DEPUTY CHAD BOLEN …………………………………….7

    D.  BODY CAMERA VIDEOS …………………………………………..…………10

III.   ANALYSIS…………………...…………………………………………………14

    A.  EXPECTATION OF PRIVACY/STANDING. . . ……………….…………….….15

    B.  WARRANT EXCEPTION – ABANDONED PROPERTY ………………….……...18

    C.  INVESTIGATION/COMMUNITY CARETAKING …..……………………………20

        1.   INVESTIGATION - EXIGENT CIRCUMSTANCES…………………………22

        2.   COMMUNITY CARETAKING…………………………………………..23

IV.   RECOMMENDATION AND ORDER…………………………………………......26

## I.      INTRODUCTION

This matter comes before the Court pursuant to Defendant's Motion to Suppress the Fruits of an Illegal Search and Request for Hearing (Dkt. 28) and Memorandum in Support (Dkt. 28-1), both filed November 9, 2020 by Jamie Lee Miles ("Defendant"). Defendant seeks to prohibit the government from using as evidence a firearm found as a result of a warrantless search. The government resisted the motion on November 20, 2020. Dkt. 33. The matter was referred to this Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) for report and recommendation by District Judge Stephanie M. Rose. Dkt. 40.  Trial is set for March 29, 2021. Dkt. 49.

An evidentiary hearing was held on January 11, 2021. Dkt. 44. The government appeared by Assistant U.S. Attorney Andrea Glasgow. Defendant appeared personally and with his attorney, Murray Bell. Testimony was received from Johnson County Sherriff's Office Lieutenant Matt Hendricks and Deputies Chase Murray and Chad Bolen. The Court received three exhibits offered by the government without objection: Exhibit 1 – Body Camera Video of Deputy Bolen; Exhibit 2 - Body Camera Video of Lt. Hendricks; and Exhibit 3 - Body Camera Video of Deputy Murray. The parties were allowed to file post-hearing briefs. *Id.* The government filed its supplemental response to Defendant's motion on January 12, 2021. Dkt. 48. On January 15, 2021, Defendant filed his Reply to the Government's Supplemental Response. Dkt. 50.

The Court considers the matter to be fully submitted. This Magistrate Judge has carefully considered the record evidence, including the exhibits admitted, the briefs filed by both parties, the arguments and statements of counsel and submits the following report. As set forth below, based on the facts presented and applicable law, it is recommended that the motion be denied.

## II.      FINDINGS OF FACT

A criminal complaint was filed on July 31, 2020 against Defendant alleging him of being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Dkt. 1. Subsequently, a one count indictment was filed August 4, 2020 alleging the same criminal violation against Defendant and seeking forfeiture of any firearms, magazines and ammunition. Dkt. 5. The charge against Defendant arose on May 30, 2020 when Johnson County Sheriff's Officers responded to a rural Oxford, Iowa residence for a reported trespassing.  The residence in question belonged to Dawn Thomas, the grandmother of Defendant's minor child.  Present at the residence at the time law enforcement arrived were Defendant; Dawn Thomas; Robert Miller, Dawn Thomas' significant other/spouse; Tammie, the daughter of Dawn Thomas and the mother of Defendant's minor child; the Defendant's minor child and another minor child**.**

### A. Testimony of Lieutenant Matt Hendricks

Lt. Matt Hendricks of the Johnson County Sheriff's Office testified. He has been with the Johnson County Sheriff's office since 1998. He began his career in communications as a 911 dispatcher and became a deputy sheriff in 2006 working in the jail division. In 2007, he graduated from the Iowa Law Enforcement Basic Academy. From 2006-2010, he worked in the jail division and then was transferred to patrol. From 2011-2020, he was also a K-9 handler. He has been a member of the hostage negotiations team and has been a department instructor on the use of force. He became a patrol sergeant in 2013 and was appointed lieutenant in December 2020.

On May 30, 2020 around 2:00 a.m., Lt. Hendricks was dispatched to a residence in rural Oxford, Iowa located in a trailer court between Tiffin and Oxford. The initial dispatch reported a person trespassing, with a thirty-minute time delay from the initial dispatch. Lt. Hendricks explained a thirty-minute delay means from the time the trespassing had occurred, thirty minutes

had elapsed before notification. Because of this, he believed the trespassing subject was no longer present and anticipated he and Deputy Chad Bolen would go to the scene to take a report and speak with the complainant. As he made his way to the residence, Lt. Hendricks received updated information from dispatch indicating the trespasser was still at the residence and may have a gun. He was also informed other occupants of the residence were present, including children.

Deputy Bolen arrived in the area of the call prior to Lt. Hendricks, but both pulled up to the residence at the same time. Initially, Lt. Hendricks saw a male standing outside, and later identified the individual as Robert Miller, one of the 911 callers. Miller told Lt. Hendricks he was concerned for the safety of the people inside the residence. Miller identified the owner of the residence as his wife/significant other, although he lives in a separate residence nearby. Miller stated his daughter was in a breakup with her boyfriend who had posted alarming messages on social media over the past couple of days mentioning hurting himself and taking other people with him. Miller identified Defendant as his daughter's boyfriend who was in the residence. Miller believed he had a gun with him inside the residence.

Next, Lt. Hendricks and Deputy Bolen approached the front door of the residence to try to contact Defendant. As the front door was unlocked, Lt. Hendricks and Deputy Bolen opened the door but remained outside. The inside of the residence was dark, so Lt. Hendricks and Deputy Bolen used their flashlights and could see Defendant seated on a couch just inside the door. Defendant was approximately fifteen feet away from Lt. Hendricks and Deputy Bolen. Defendant was ordered to come out, to show his hands and to speak to Lt. Hendricks and Deputy Bolen. Defendant came out without incident. Defendant was patted down, and no weapons were located on Defendant's person.

Lt. Hendricks talked to Defendant. He asked Defendant why he was there, who he was there with, what he was there to do and explained why law enforcement was present. Defendant informed Lt. Hendricks he took an Uber to the residence in hopes of seeing his daughter. Defendant identified the trailer as his girlfriend's mother's residence. Two children were present at the residence, one of whom was Defendant's daughter. Defendant indicated he simply opened the unlocked front door of the residence and walked in as he had done on previous occasions. Defendant admitted it was not typical for him to come to the residence in the middle of the night. He also admitted to making posts on social media recently regarding hurting himself and to having issues with his girlfriend Tammie, the mother of his child. Lt. Hendricks reported Defendant's demeanor was initially confrontational and then he later calmed down.

Lt. Hendricks said it was slightly unusual for people to act the way Defendant acted. Lt. Henricks testified he was concerned about Defendant's mental well-being and told Defendant as much. He tried to convince Defendant multiple times to go the hospital for an evaluation. While Lt. Hendricks was speaking with Defendant on the deck at the front of the residence, Deputy Bolen informed Lt. Hendricks a gun was found inside. Lt. Hendricks left Defendant with Deputy Chase Murray who had also arrived on scene. Prior to the gun being located, Lt. Hendricks had not run Defendant's criminal history and did not know whether Defendant was going to be arrested. After Deputy Bolen found the gun and at the end of their interaction, Defendant was arrested for being in possession of the gun.

### B.    Testimony of Deputy Chase Murray

Deputy Chase Murray has been employed as a deputy sheriff with the Johnson County Sheriff's office for almost three years. He began his employment by working in the jail, attended and graduated from the Iowa Law Enforcement Academy and is currently a patrol deputy. While

on duty May 30, 2020, he was dispatched as backup to respond to a call around 2:00 a.m. near rural Oxford, Iowa. Deputy Murray testified the initial dispatch was for a trespass. Because it sounded like the subject had left, he was not going to go to the call. However, dispatch then said the subject was in the residence. Because of this, he decided to report to the scene as backup. Dispatch then relayed the subject had a gun.

When he arrived at the scene, Lt. Hendricks and Deputy Bolen were already present. At this point, to the best of his knowledge, no one had done a criminal record check for Defendant. Deputy Murray spoke to Robert Miller for approximately one minute. Miller was frustrated about his belief Defendant was lying to the officers about permission to be at the residence. Although he was not part of the conversation, Miller was standing close enough to hear bits and pieces of the conversation on the front porch between Defendant, Lt. Hendricks, and Deputy Bolen. Deputy Murray attempted to calm Miller as he was very uptight and seemed a little bit overwhelmed by everything. Miller expressed concern about the people in the residence, specifically Dawn, who he referred to as a friend/significant other.

Deputy Murray and Miller next went to the back door of the residence to attempt to contact Dawn to make sure she was okay. Deputy Murray and Miller entered the residence and spoke to Dawn inside. Dawn appeared very worried and scared, she was crying and appeared to be "coming down" from what had just happened. Deputy Bolen joined them, and questioned Dawn about the situation. Dawn described how she woke up due to her daughter calling her. Her daughter told her Defendant was inside her residence. Dawn indicated she was very scared when she heard this information. Dawn said she walked out to Defendant to ask why he was in the residence. Defendant told her he was there to get his child. Dawn said this frightened her. She proceeded back to the hallway and stood there with a baseball bat until officers arrived. Dawn was concerned because

there were children present at the residence and because Defendant had been talking about obtaining a gun over the past several days. Miller asserted Defendant did, in fact, have a gun. Dawn said Defendant was not welcome at the residence but knows she keeps her door unlocked, so he walked through the front door. Defendant had come to the residence on other occasions to see his child and could do so, but on the night in question, Dawn was not aware Defendant was coming as he had not been invited. Deputy Bolen left the conversation at this point to go over to the couch area in the residence where Defendant had been seated. Deputy Murray remained with Miller and Dawn. Prior to this time, Deputy Murray had not run Defendant's criminal history nor was Defendant under arrest.

### C.  Testimony of Deputy Chad Bolen

Deputy Bolen has worked for the Johnson County Sheriff's office for a little over four years. He is a member of the drug task force and is an instructor for several special training areas, including defensive tactics, baton and pepper spray instruction. On May 30, 2020, he was a deputy in the patrol division and was dispatched to the residence. Initially, he understood he was responding to a trespass where a person was unwelcome, with a thirty-minute time delay. While on route, dispatched further advised him there was an unwanted person in the residence who most likely had a gun. Further, Deputy Bolen was advised there were occupants, potentially children, present. He arrived at the entrance to the trailer park and waited for Lt. Hendricks to get behind him due to the information concerning a potential firearm. Deputy Bolen and Lt. Hendricks then proceeded to the residence.

At the scene, Deputy Bolen spoke to Robert Miller, who had made the call to 911. He recalled certain details such as Miller wearing a yellow shirt, appearing frantic and very scared as to what was going on inside the residence. Deputy Bolen spoke with Miller outside the residence.

He informed Deputy Bolen someone in the residence, who had a relationship with his daughter, Tammie, had been discussing suicide in the last few days over social media and he believed that person had a gun. Miller also indicated this person had sent messages indicating he was currently inside the residence. While speaking with Miller, Tammie arrived, and Deputy Bolen briefly spoke with her. Tammie seemed to be scared as well and was crying.

Deputy Bolen and Lt. Hendricks then decided they wanted to talk with this person, so they approached the door to the residence, Lt. Hendricks opened it and called to the person sitting on the couch to come outside and talk to them. Deputy Bolen could not remember if there was only one door or if there was an additional screen door. The door to the residence opened inward. Initially, Deputy Bolen was behind cover, and then he moved and was able to see Defendant sitting on the couch. Deputy Bolen estimated Defendant to be eight to ten feet away from the door but admitted Defendant could have been ten to fifteen feet away from where he was standing. Defendant came out of the residence willingly. Lt. Hendricks conducted a pat down of Defendant and no weapons were located. Deputy Bolen testified a pat down is normally done for officer safety when anyone says anything about a firearm.

Deputy Bolen and Lt. Hendricks asked Defendant questions about what was going on and Deputy Bolen said they heard there was a gun. Deputy Bolen asked Defendant what they would find in the residence and would there be any reason to believe he had a gun. Deputy Bolen could not remember the exact words he used when questioning Defendant. He confirmed he asked Defendant about the gun, used the word "gun" and asked two questions to Defendant. He acknowledged he asked the questions quickly because he thought the first question was misleading and did not let Defendant answer the first question. Defendant said something along the lines there

was no gun at all. Defendant did not make any statements about having anything inside the residence.

Deputy Bolen spoke with Miller again outside and found out Dawn was inside the residence with two children. Deputy Bolen went inside and found Dawn holding a baseball bat as if she was going to use it, with tears streaming down her face. Deputy Bolen identified himself as a deputy because of her emotional state. He then went to the area by the back bedroom where Dawn opened the door and he located two children in a bed. Defendant was still outside at this time. Deputy Bolen spoke with Dawn and she said Defendant had come to the residence before, he is welcome, but she does not like when he comes in unannounced at night. Dawn did not say she saw a gun. Dawn confirmed the front door was unlocked and Defendant just walked inside. She was unaware Defendant was going to be there. While speaking with Dawn, Deputy Murray and Miller came inside. The four people spoke about why Miller believed Defendant should not be there. Deputy Bolen wanted to find out if Defendant was able to be there or not and if Dawn and Miller wanted to have Defendant charged regarding this situation. Miller was very adamant Defendant be charged. Dawn was concerned because she did not want Defendant coming over in the middle of the night. Miller again indicated Defendant had a gun but did not know where it was.

At this point, no decision had been made as to whether Defendant would be charged regarding the situation, no decision had been made regarding Defendant being arrested and no criminal history search of Defendant had been run. Deputy Bolen informed Dawn and Miller he would search by the couch where Defendant had been seated to check for a gun. Neither objected to this. Deputy Bolen went to the couch and checked the cushions. He stated his purpose in searching was due to Miller and Dawn's belief there was a gun at the residence. Additionally, for officer safety and the safety of the other people at the residence, including Defendant, Deputy

Bolen wanted to make sure there was not a gun easily accessible by anyone. He moved an ashtray off the couch and then saw a bag. The bag was a cloth, unstructured, draw string bag, brightly colored, pink or purple, Under Armour bag. Deputy Bolen testified there was no discussion about Defendant carrying the bag. Although Deputy Bolen acknowledged no one specifically gave him permission to search the bag, he felt the bag and looked inside, locating a handgun. As is his practice, he immediately cleared the gun including the chamber, so the gun would not go off if it was manipulated or if someone looked for the serial number. At this point, Deputy Bolen contacted dispatch to find out if Defendant had a permit to carry. Dispatch confirmed Defendant did not have a permit to carry.

**D. Body Camera Videos**

Each of the law enforcement officers were wearing a body camera and portions of the videos from each of them were received into evidence. Exhibit 1 is the body camera video of Deputy Bolen which runs from the time he encountered Miller outside of the residence until shortly after the discovery of the gun in the residence. Exhibit 2 is the body camera video of Lt. Hendricks which also runs from the time he encountered Miller outside of the residence with Deputy Bolen until he discusses the discovery of the gun with Deputy Bolen. Exhibit 3 is the body camera video of Deputy Murray which runs from when he encounters Miller after Lt. Hendricks requested Defendant step outside of the residence until the discovery of the gun. Because the time and location of the body camera videos overlap with each other, set forth below is a collective summary of the information from all three exhibits reviewed by this Magistrate Judge bearing on the issues presented. The body camera videos confirm and support the testimony of the officers at the hearing on this motion. The body camera videos do, however, provide more detail into exactly what a

particular person said and show the demeanor, emotional state and mood of the individuals involved.

The body camera videos of Deputy Bolen and Lt. Hendricks show the initial interaction with Miller outside of the residence.  Miller indicates Defendant is in the residence at that time and he thinks he has a gun. Miller states Defendant has been posting pictures on social media about being in the residence. When asked, Miller says Defendant has not threatened anyone while at the residence, but Defendant has made comments in the last few days which he refers to as "pretty unsettling." Deputy Bolen then receives word from dispatch two children are present in the residence. He confirms this with Miller who indicates they are in the back bedroom. Miller explains his daughter Tammie and Defendant are breaking-up and he does not believe Defendant has a current address. Miller volunteers Defendant may have a gun on his lap inside the residence, but he is not sure. He says Defendant has been making comments recently he was going to kill himself and take people with him. Miller informs them Defendant is waiting for Tammie to show up to the residence.  Tammie then arrives at the scene.

Following this interaction, Lt. Hendricks and Deputy Bolen approach the front door of the residence. Lt. Hendricks calls Defendant out of the residence. He comes outside voluntarily, is calm and polite, but seems confused about the situation. When questioned by the officers, Defendant indicates he does not know why the officers are at the home. Lt. Hendricks tells him they are going to sit down and have a conversation. He then pats down Defendant. As he does so, Deputy Bolen asks Defendant "is there anything in the house at all" and before Defendant can answer, asks "would there be any reason for anyone to believe you have a gun at all?" Defendant answers "no". Over several minutes, Defendant calls to Dawn multiple times to help him not get in trouble. Defendant tells Lt. Hendricks and Deputy Bolen he knocked on the residence door, did

not get an answer and walked in as he has done in the past. Defendant admits he does not usually come to the residence at this time of night and just wanted to see his daughter. Lt. Hendricks tells him he is detained at that time for trespassing. Defendant is adamant he is the biological parent for his daughter and both he and Tammie have custody of the daughter. Tammie confirms she has a child with Defendant.

Deputy Bolen leaves Defendant with Lt. Hendricks and approaches Miller outside of the residence to relay to him what Defendant had stated. Deputy Bolen also talks to Tammie about this, as well. Miller indicates he wants Defendant to be charged. Deputy Bolen informs him he is going to talk to Dawn. Deputy Bolen enters the front of the residence and walks toward Dawn, who can be seen in the back of the residence. As he approaches her, he appears to startle her, telling her "it's just me, a deputy." It appears Dawn is holding something resembling a baseball bat, lowering it once Deputy Bolen identifies himself. The body camera video is not very clear at this point, but Dawn appears distraught.

While Deputy Bolen is with Dawn inside the residence, outside Miller can be heard indicating he is angry because he believes Defendant is lying to the officers. It appears Miller is yelling at Defendant telling him he knows he is not supposed to be at the residence. Deputy Murray attempts to calm down Miller.

Deputy Bolen returns outside of the residence and relays information he has learned from Dawn to Miller. He also returns to where Lt. Hendricks is with Defendant and asks him about his daughter, confirms her name and Defendant's first name. Defendant yells to Dawn, apologizing, with Dawn responding he scared her. Deputy Bolen returns inside the residence, to speak with Dawn in the front room. As she speaks with Deputy Bolen, Dawn is emotional, says she was terrified and is afraid of retaliation if Defendant goes to jail. Upset, she retreats to the back of the

residence, and Deputy Bolen follows. During this time, Deputy Murray follows Miller to the back door of the residence and enters with Miller as Deputy Bolen approaches Dawn from the inside in the back of the residence.

Deputy Bolen continues his conversation with Dawn. She says Defendant is welcome at the residence, but not at this time of night. She explains he and Tammie are in the process of breaking-up and he had been threatening suicide. She learned Defendant was present in her residence when Tammie called her to let her know Defendant was in her living room. Dawn explains the door to the residence was unlocked, Defendant came into the residence and he told her he was there to get his daughter. She left the front area of the residence and remained in the back area "terrified with a baseball bat." She called Miller when she found out Defendant was in the residence. Dawn said she told Tammie to tell Defendant to get out of the residence.

Miller tells Dawn to tell Deputy Bolen to charge Defendant. Dawn is unsure of what to do. Deputy Bolen explains they are trying to figure out what happened as it relates to a charging process with Defendant. Dawn says she is not comfortable with Defendant coming into her residence without her permission. Deputy Bolen affirms he saw her terrified, holding the baseball bat when he first approached her. Deputy Bolen asks Dawn and Miller about a gun, relaying he was told there was potentially a gun, asking if they think Defendant has a gun. Dawn states "he's been threatening that" and Miller states "he has one, we know that he has one."

Deputy Bolen tells Dawn and Miller he is going to check the couch for a gun. He finds the purple Under Armour bag, palpates the outside, then uses a flashlight to look inside the bag. He says there is some weed in the bag and then alerts to the gun. Miller confirms the bag is "his" meaning Defendant's and Dawn verbalizes her anger indicating it is not her bag. Dawn can be heard crying. Deputy Bolen radios the serial number of the gun to dispatch and it does not come

back stolen. Deputy Bolen then asks for permission to search the residence and Dawn gives consent. Deputy Bolen confirms through dispatch Defendant does not have a permit to carry.

Meanwhile, as Deputies Bolen and Murray speak with Miller and Dawn inside the residence, Lt. Hendricks talks to Defendant regarding his postings on social media about wanting to hurt himself. Over several minutes, Lt. Hendricks questions Defendant about his mental status and tries to convince Defendant to go to the hospital for a mental evaluation. Defendant tells Lt. Hendricks he has always felt like this and confirms he will be "100% ok." Lt. Hendricks then enters the residence and he and Deputy Bolen discuss with each other what they have learned about the situation. Lt. Hendricks informs Deputy Bolen Defendant indicated he is on probation for a domestic charge involving someone other than Tammie. Deputy Bolen describes Dawn as scared for her life and he walked over to the couch in the living room to make sure there was no gun present. He found a bag and discovered the gun in the bag.

### III.    ANALYSIS

Defendant seeks to suppress the warrantless search of the purple Under Armour bag and to prohibit the government from using as evidence the firearm found as a result of that search. Dkts. 28, 50. Defendant does not contest the search of the residence, only the search and seizure of the bag. Dkt. 50 p. 1. He contends no exceptions apply authorizing a warrantless search of the bag. Dkt. 28-1 p. 2. In particular, Defendant maintains proper consent to search the bag was not obtained, the firearm was not in plain view, the exception for a search incident to arrest is inapplicable and exigent circumstances did not exist to allow for the search. *Id.* pp. 1-4. Defendant also contests the suggestion law enforcement officers were acting in a community caretaking function when they searched the bag. Dkt. 50.

The government resists the motion, asserting several exceptions to the warrant requirement exist. Dkts. 33, 48. The government contends, because Defendant was wrongfully in the residence, he had no reasonable expectation of privacy. Dkt. 33 pp. 5-6. Even if not wrongfully present, at most he was only a guest and did not have a reasonable expectation of privacy in the residence as a "mere guest." *Id.* The government further argues the search was lawful as Defendant had abandoned the bag. *Id.* p. 7. In addition, exigent circumstances justified the warrantless search of the area where Defendant had been to ensure there was not a weapon present. *Id.* pp. 8-9. Finally, the government argues the community caretaking function applies authorizing the search. *Id.* pp. 9-11.

The government does not assert the gun was in plain view. In addition, although Defendant suggests the search incident to arrest exception does not apply in his initial briefing, the government does not assert the application of the exception in this instance. Indeed, because the contested search occurred before any arrest, it does not appear the exception would apply. *See U.S. v. Rowland,* 341 F.3d 774, 783 (8th Cir. 2003); *U.S. v. Allison*, 637 F. Supp. 2d 657, 673 (S.D. Iowa 2009), *aff'd* 454 F. App'x 521 (8th Cir. 2011). Consequently, this Magistrate Judge will not address whether the gun was in plain view or an exception to the warrant requirement applies for a search incident to arrest. Each of the remaining arguments will be addressed in turn.

### A.      Expectation of Privacy/Standing

The Fourth Amendment forbids "unreasonable searches and seizures." U.S. Const. amend. IV.  Its requirement that searches and seizures "be founded upon an objective justification" applies to all seizures, even those "that involve only a brief detention short of traditional arrest." *United States v. Mendenhall*, 446 U.S. 544, 551 (1980) (citation omitted). The Eighth Circuit recently explained:

> Fourth Amendment standing is "useful shorthand for capturing the idea that a
> person must have a cognizable Fourth Amendment interest in the place searched
> before seeking relief for an unconstitutional search," but it does not implicate
> Article III jurisdiction. *Byrd v. United States*, ⸺ U.S. ⸺, 138 S. Ct. 1518, 1530,
> 200 L.Ed.2d 805 (2018). We must determine whether [the defendant] "had a
> legitimate expectation of privacy in the area searched or the item seized." *United
> States v. Gomez*, 16 F.3d 254, 256 (8th Cir. 1994) (citing *Rakas v. Illinois*, 439 U.S.
> 128, 138–44, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978)). There is no "single metric or
> exhaustive list of considerations," but a defendant's expectation of privacy must be
> grounded in property law or understandings that are recognized by society. *Byrd*,
> 138 S. Ct. at 1527. The defendant bears this burden by a preponderance of the
> evidence. *See United States v. Anguiano*, 795 F.3d 873, 878 (8th Cir. 2015).

*United States v. Bettis*, 946 F.3d 1024, 1027 (8th Cir. 2020).

Factors relevant to the determination of standing include: ownership, possession and/or control of the area searched or item seized; historical use of the property or item; ability to regulate access; the totality of the circumstances surrounding the search; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of the expectation of privacy considering the specific facts of the case. *Gomez*, 16 F.3d at 256. If a defendant fails to prove a sufficiently close connection to the relevant places or objects searched, he has no standing to claim that they were searched or seized illegally. *Id.*

The government contends Defendant does not have standing to challenge the search of the purple Under Armour bag. Dkt. 33 pp. 5-6. The government notes the Supreme Court has held that while an "overnight guest" has a reasonable expectation of privacy in a home, one who is merely present with the consent of the householder may not. *Id.* p.5. Additionally, the government argues Defendant was wrongfully at the residence and, thus, cannot move to suppress evidence obtained as a result of the search. *Id.* Defendant contests these arguments, asserting a right to privacy in the bag. Dkt. 50 p. 1. He notes the cases cited by the government relate to searches of premises, not individual "effects" located in such premises. *Id.* Defendant emphasizes he does not challenge the right to search Dawn's entire residence, only the search of the bag. *Id.*

Applying the factors from *Gomez,* the present case contains facts both supporting and undermining a finding of standing. Those suggesting standing include Deputy Bolen knew Defendant had recently been in the area of the couch and had been told Defendant had something on his lap while on the couch. When examining the area, the only item on the couch, besides an ash tray, was the bag. Defendant had been at the home before, although not recently. He had previously been welcomed into the residence. When Deputy Bolen determined the bag to contain a firearm, both Dawn and Miller confirmed it was Defendant's bag and neither of theirs.

On the other hand, Defendant was not an overnight guest as Dawn indicated he was welcome at the home but not without her knowledge and not at this time of night. It was not clear he even had permission to be in the residence on the date in question. Defendant acknowledged it was odd for him to be at the residence in the middle of the night. As the residence door was left unlocked, the possession of a key to the residence holds less weight as a factor as does the ability to regulate access to the home. As the government notes, he "did not live at the residence, did not stay overnight at the residence, did not have a key to the residence, did not have any possessory interest in the residence, did not store personal belongings at the residence, and did not have a right to exclude others from the residence." Dkt. 48 p. 4.

The cases noted by the government demonstrate clearly a guest (not an overnight guest) or someone without permission to be present at a premises do not have an expectation of privacy to a search of such premises. However, the cases do not go as far as the government seemingly urges to suggest such a person would lose all rights to privacy as to any of their personal effects at such premises. Indeed, if the firearm in this case was located in between the cushions of the couch in the front room, it would seem all parties might agree Defendant had no right to privacy to a search of the couch and its cushions. But the question as to the bag appears to be a different issue.

Accordingly, in light of the factors on both sides of the issue and lack of clear case law, for purposes of this Report and Recommendation, this Magistrate Judge will assume Defendant has standing and an expectation of privacy in the bag in order to challenge its search.

### B.    Warrant Exception – Abandoned Property

The warrantless seizure of abandoned property does not violate the Fourth Amendment. *United States v. Segars*, 31 F.3d 655, 658 (8th Cir. 1994); *Abel v. United States,* 362 U.S. 217, 241 (1960). This is because "[w]hen individuals voluntarily abandon property, they forfeit any expectation of privacy in it that they might have had." *Id.*; *United States v. Jones,* 707 F.2d 1169, 1172 (10th Cir. 1983), *cert. denied,* 464 U.S. 859 (1983). "The existence of police pursuit or investigation at the time of abandonment does not of itself render the abandonment involuntary." *Id.* "An expectation of privacy is a question of intent, which 'may be inferred from words spoken, acts done and other objective facts.'" *Id.* (citation omitted). However, abandonment cannot be the product of unlawful police conduct. *Id.*; *United States v. Koessel,* 706 F.2d 271, 274 (8th Cir. 1983).

The issue "is not abandonment in the strict property right sense, but rather, whether the defendant in leaving the property has relinquished her reasonable expectation of privacy so that the search and seizure is valid." *United States v. Tugwell*, 125 F.3d 600, 602 (8th Cir. 1997); *United States v. Hoey,* 983 F.2d 890, 892-93 (8th Cir. 1993) (other citations omitted). Whether an abandonment has occurred is determined on the basis of the objective facts available to the investigating officers, not on the basis of the owner's subjective intent. *Id.; See United States v. Rem,* 984 F.2d 806, 810 (7th Cir. 1993). "This determination is to be made in light of the totality of the circumstances, and two important factors are denial of ownership and physical relinquishment of the property." *Id.; United States v. Nordling,* 804 F.2d 1466, 1469 (9th Cir.

1986). We consider only the information available to the officers at the time of the search. *Id.; see Rem*, 984 F.2d at 811 ("In order to determine whether a pre-search abandonment has occurred, the flow of information considered stops at the moment the police officer opened the suitcase.").

The government contends Defendant left the bag in the residence when officers asked him to step outside and also denied to the officers he had any property in the residence. Dkt. 33 p. 7. It is without dispute Defendant left the bag on the couch in the front room of the residence when Lt. Hendricks asked him to step outside. The question is whether, by doing so, this constituted physical relinquishment by Defendant of the bag. Again, there are facts suggesting both conclusions. As noted by the government, Defendant left an unsecured bag, in the common area of someone else's residence, suggesting relinquishment. Dkt. 48 p. 4. On the other hand, Lt. Hendricks was advised Defendant had something on his lap, suggesting the possibility of Defendant having personal items. Defendant was told the officers were going to have a conversation with him. Defendant believes he has done nothing wrong and remains calm with the officers. Defendant indicates through his words he is there to see his daughter and believes he has the right to do so even after the pat down. There is no information Defendant thought he was leaving the home. Less than fifteen minutes had elapsed from the time of Defendant leaving the couch area to the finding of the bag.

As to denial of ownership, the government contends when officers patted Defendant down and asked him "is there anything in the house at all? Would there be any reason for anyone to believe that you had a gun at all?" and Defendant responded "no", by doing so he denied having any property in the residence. Dkt. 33 p 7.  However, this is not how Deputy Bolen described the situation. He testified he asked the two questions quickly because he thought the first question was misleading and did not let Defendant answer the first question. Therefore, Defendant's response

to Deputy Bolen's questions does not constitute a denial of ownership or possession of any items in the residence. Further, in its response to Defendant's motion, the government suggests the evidence will show when Defendant was ultimately placed under arrest, he repeatedly denied ownership of the bag, kept asking "What bag?", stated the residence was not his house, he did not know who the bag belonged to and he did not bring a bag with him. Dkt. 33 p. 4. However, no such evidence was presented at the hearing on this matter.

Based on the totality of the circumstances, in light of the factors on both sides of the issue, for purposes of this Report and Recommendation, this Magistrate Judge will assume Defendant did not abandon the purple Under Armour bag.

### C.      Investigation/Community Caretaking

The government contends the search of the bag was appropriate both due the existence of exigent circumstances and because the officers were acting in a community caretaking function. Dkt. 33 pp. 8-11. The Eighth Circuit has noted different standards apply when an officer makes a warrantless entry acting as a community caretaker than when making a warrantless entry to investigate a crime. *U.S. v. Quezada,* 448 F.3d 1005, 1007 (8th Cir. 2006).

> Police officers, unlike other public employees, tend to be "jacks of all trades," who often act in ways totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of criminal law. *Cady v. Dombrowski*, 413 U.S. 433, 441, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973). These activities, which are undertaken to help those in danger and to protect property, are part of the officer's "community caretaking functions." *Id*. They are unrelated to the officer's duty to investigate and uncover criminal activity. A police officer may enter a residence without a warrant as a community caretaker where the officer has a reasonable belief that an emergency exists requiring his or her attention. *Mincey v. Arizona*, 437 U.S. 385, 392–93, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978); *United States v. Nord*, 586 F.2d 1288, 1291 n. 5 (8th Cir. 1978).
>      When acting to investigate and uncover crime, on the other hand, a police officer acts at the core of his or her duties; it is to these types of actions that the warrant clause of the fourth amendment is directed. *See Johnson v. United States*, 333 U.S. 10, 14, 68 S.Ct. 367, 92 L.Ed. 436 (1948). A warrantless entry in such circumstances must be justified by probable cause to believe that a crime has been

or is being committed and the existence of what are called exigent circumstances. Examples of such circumstances are when an officer is in hot pursuit of a fleeing felon, and when an officer reasonably fears the imminent destruction of evidence or reasonably perceives a risk of danger to the police or others. *Minnesota v. Olson*, 495 U.S. 91, 100, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990).

        The Supreme Court has held that reasonable belief, the standard used when determining whether an officer may enter as a community caretaker, *see Mincey*, 437 U.S. at 392–93, 98 S.Ct. 2408, is a less exacting standard than probable cause. *Maryland v. Buie*, 494 U.S. 325, 336–37, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990). This has led to some concern that a police officer might use his or her caretaking responsibilities as a pretext for entering a residence. The Ninth Circuit, therefore, has held that to justify an entry like the one in the present case an officer must have actually believed that an emergency existed and the belief must have primarily motivated his or her actions. *See United States v. Cervantes*, 219 F.3d 882, 890 (9th Cir. 2000), *cert. denied*, 532 U.S. 912, 121 S.Ct. 1242, 149 L.Ed.2d 150 (2001). This is contrary to the principle applicable when an entry is justified by probable cause to believe that a violation of law has occurred or is occurring; in those situations, the subjective intent of the officer is immaterial, *see Whren v. United States*, 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996).

*Id.* at 1007-8.

        In assessing whether either of these apply, it must first be determined the capacity in which the officers were acting. *U.S. v. Harris*, 747 F.3d 1013, 1018 (8th Cir. 2014). As noted by the Eighth Circuit in *Quezada*, if the officer is acting to investigate a crime, then a warrantless search must be justified by probable cause to believe a crime has been or is being committed and the existence of exigent circumstances. *Quezada*, 448 F.3d at 1007. Examples of exigent circumstances include pursuit of a fleeing felon, fear of imminent destruction of evidence or reasonable perception of risk of danger to officers or others. *Id.*

        On the other hand, if it is determined that the officer was not acting to investigate a crime but rather had a reasonable belief an emergency exists requiring his or her attention, then the court may consider whether the officer was acting in a community caretaker function. *Id.* If acting in this capacity, the court must weigh the government's interest in the officers' actions against the person's right to be free from government intrusion. *Harris*, 747 F.3d at 1018. If the initial

intrusion is found to be justified, the court must then assess whether the scope of the intrusion was carefully tailored to satisfy the purpose of the intrusion. *Id*. at 1019.

### 1.     Investigation - Exigent Circumstances

In this case, it does not appear to this Magistrate Judge the officers were acting in a manner constituting investigation of a crime. The circumstances presented to the officers significantly shifted several times from the onset of the initial call from dispatch. Initially, the officers were advised of a call for a potential trespass, with the subject apparently no longer on the scene. Thus, the officers believed they would likely only be taking a statement of the complainant. Shortly thereafter, the officers were told by dispatch the subject was on scene and may have a gun. This changed the tenor of the response for the officers. Indeed, upon arrival, the officers were immediately met by Miller, who described Defendant as being seated in the front room of the residence, distraught over a break up with the mother of his child, he might have a gun, he had been posting comments he might hurt himself and possibly others and children were present in the residence.

Next, Lt. Hendricks and Deputy Bolen approached the front door of the residence and asked Defendant to step outside. Once they patted him down and found no weapons, to a degree, tensions eased. Tensions rose again, however, when Deputy Bolen entered the living room. There he found Dawn holding a baseball bat and clearly emotional about the situation. Deputy Bolen talks with Dawn and Miller indicating he had heard mention of a gun. Dawn responds, "he's been threatening that for the last three days" and Miller firmly states "he has one, we know that he has one." At this, Deputy Bolen immediately turns around, moving quickly to the front room indicating his intent to search for a gun in the couch area of the front room.

While some parts of the encounter might suggest investigatory aspects to the officers' actions, it is clear the officers were presented with uncertain circumstances, both in terms of the relationships between the individuals involved, information sent by dispatch and as to what actually occurred. Many of those actions that might appear "investigatory" are related to sifting through the information being presented to the officers. Indeed, before the gun was found, none of the officers called Defendant's name in to dispatch to determine if he had any outstanding warrants or prohibition on possessing weapons, as is often typical. In the view of this Magistrate Judge, Deputy Bolen's actions are primarily driven to keeping people calmed down and figuring out what actually transpired; Deputy Murray takes similar actions to keep the peace and Lt. Hendricks talks calmly to Defendant about his state of mind, whether he is suicidal and whether he needs to seek help.

Even if the officers were acting in an investigatory manner, this Magistrate Judge finds exigent circumstances existed. As Defendant acknowledges, there was probable cause of a trespass by Defendant. In addition, with the unknown location of the gun, emotions running high and presence of children, the officers had an objectively reasonable belief of a risk of danger if no attempt was made to determine if a gun was present. The Eighth Circuit has noted domestic disturbances are highly volatile and involve large risks. *United States v. Henderson*, 553 F.3d 1163, 1165 (8th Cir. 2009). In *Henderson*, due to the nature of domestic disturbances and the belief of the presence of a gun, the court determined that exigent circumstances justified a search for that gun. *Id.* This holds for the situation presented to the officers here.

### 2.    Community Caretaking

In the opinion of this Magistrate Judge, based on a comprehensive review of the circumstances up to the discovery of the gun, the officers were acting in their community caretaking, "jack of all trades" role. The facts supporting this conclusion include Deputy Bolen

knew children were present, involved parties were certain Defendant had a gun, yet no gun was found on him when he was patted down, Defendant was not under arrest, and it was not clear whether Defendant would be charged with anything. In addition, none of the officers had knowledge, nor undertook to obtain any knowledge as to whether Defendant was prohibited from possessing firearms.

Because Deputy Bolen did not know whether Defendant was prohibited from possessing firearms, his desire to search for a gun was clearly based upon a concern about the safety of all involved, rather than investigation of a crime. Deputy Bolen testified to this and his actions also demonstrate his intent. The videos from the body cameras show Deputy Bolen, upon being firmly told by Miller and Dawn that Defendant had a gun, immediately turns around and heads to the front the residence where Defendant had been to search for the gun.

When viewing these actions in the context of what the officers knew and encountered, they were acting in a community caretaking role. The officers were called to the scene for a trespasser and a possible gun. This fits squarely into their role to help those in danger and to protect property. Furthermore, the officers learned about Defendant not having a permit to carry a gun *after* the gun was located thereby giving more weight to the role to help those in danger and to protect property. Observing the officers testify about their actions and what transpired also supports this conclusion. Each of them, in their testimony, credibly related their concerns and motivation to calm an emotional filled scenario and ensure the safety of those present, whether it was with concerns about Defendant's mental state or the presence of a gun.  In light of all these circumstances, it was certainly reasonable for the officers to be concerned about the presence of a gun in an unknown location at the residence.

In addition, this Magistrate Judge finds the government's interest in the officers' actions outweigh Defendant's right to be free from government intrusion. *Harris*, 747 F.3d at 1018. When the officers arrived at the residence, they learned of a relationship break-up, posts on social media with Defendant threatening harm to himself and others and Defendant was at the dwelling at an unusual time of night. The pat down of Defendant did not reveal a gun. Any number of dangerous, or even deadly, outcomes could have resulted if the officers had not intervened.[1] In less than fifteen minutes, the officers had assessed the situation, calmed the parties and found a loaded gun. The situation was not focused on enforcing a criminal statute, but on the officers' duty to serve and protect the public which included four adults and two children. The intrusion on Defendant's rights was minimal as he was not handcuffed or put in a squad car, the officers' tone was calm when they spoke with him and Defendant acknowledged his presence at the home was unusual during the middle of the night. Further, the bag searched was left on the couch in a residence that was not Defendant's and for which he did not have permission to enter.

This Magistrate Judge further finds the scope of the encounter was carefully tailored to satisfy the purpose of the initial intrusion. *Harris*, 747 F.3d at 1019. Defendant argues there is no credible evidence of a gun in the residence. Dkt. 50 p. 5. From his perspective, the only evidence was Dawn and Miller "believed" Defendant brought a gun but did not articulate why they believed this. *Id.* Defendant argues that, even if Dawn asked Deputy Bolen to check for a firearm, this only justified Deputy Bolen searching her residence not anyone else's personal property to which the resident had no rightful claim of ownership. *Id.*

---

[1] *See Florida v. J.L.,* 529 U.S. 266, 272 (2000) ("Firearms are dangerous, and extraordinary dangers sometimes justify unusual precautions.").

But the information testified to at the hearing and the information from videos from the body cameras show Defendant's argument is simply incorrect. The Court notes the protective measures the officers took to ensure their safety and the scope and duration of the intrusion. With the knowledge about the disintegrating relationship, something seen on Defendant's lap, no gun found during the pat down, multiple people, including children, at the scene, Defendant last visiting the residence several weeks before, the time of night and the confusion of Defendant during the encounter with the officers, Deputy Bolen was certainly justified to look for a gun in the immediate area of the couch. Miller and Dawn were quite firm in their belief Defendant possessed a gun. Knowing Defendant had recently been on the couch, it was objectively reasonable for Deputy Bolen to look in the bag located in the exact area where Defendant was, mere minutes before the gun was found.

For these reasons, this Magistrate Judge finds the community caretaking function applies in this case and the search of purple Under Armour bag was not illegal.

## IV. RECOMMENDATION AND ORDER

IT IS RESPECTFULLY RECOMMENDED, Defendant's Motion to Suppress the Fruits of an Illegal Search and Request for Hearing (Dkt. 28) be denied.

IT IS ORDERED, the parties have until February 19, 2021 to file written objections to the Report and Recommendation, pursuant to pursuant to 20 U.S.C. § 636(b)(1), Fed. R. Crim. P. 59(b)(2), and L.Cr.R. 59.

**IT IS SO ORDERED.**

**DATED** this 5th day of February, 2021.

                                  _____
                                  STEPHEN B. JACKSON, JR.
                           UNITED STATES MAGISTRATE JUDGE